## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SUPERIOR BUICK GMC,

      Plaintiff,

vs.

DISCOVER PROPERTY & CASUALTY,

      Defendant.

Case No. 4:10-cv-11641
Hon.  Mark A. Goldsmith

_____

ATTORNEY FOR PLAINTIFF
JOHN C. KAPLANSKY (P23354)
30200 Telegraph, Suite 440
Bingham Farms, MI 48025
(248) 258-9444 / (248) 258-5854
j.kaplansky@att.net

ATTORNEY FOR DEFENDANT
DENNIS M. DOLAN
303 W. Madison, Suite 300
Chicago, IL 60606
(312) 781-6641 / (312) 781-6630
dolan@litchfieldcavo.com

ATTORNEY FOR DEFENDANT
MICHAEL F. CONDIT (P38095)
 6905 Telegraph Road, Suite 215
Bloomfield Hills, MI 48301-3159
(248) 645-5205 / (248) 645-0917
mfcondit@aol.com

_____

### PLAINTIFF'S
### MOTION FOR SUMMARY JUDGMENT

      Plaintiff Superior Buick, through its attorney John C. Kaplansky, respectfully asks that this honorable court summary judgment in its favor pursuant to Fed. R. Civ. P. 56.  In support of its motion, plaintiff states as follows:

      1.     Plaintiff is an automobile dealership located in Dearborn, Michigan.

      2.     At all relevant times Plaintiff maintained a policy of insurance with Discover Property and Casualty Company, a division of Travelers Insurance, which included coverage for "employee dishonesty".

- i -

3.      At all relevant times Lilana ("Lila") Sinishtaj was an employee of plaintiff whose primary duty was to secure financing for "credit-challenged" purchasers.

4.      "Drive" or "Drive Financial" ("Drive") made many if not most of the loans secured by Sinishtaj.

5.      To induce Drive to make loans, Sinishtaj falsified information on credit applications to Drive about the collateral securing the loans and the credit-worthiness of some of the customers.  False information included false employment and earnings records, as well as false descriptions of the equipment on the vehicle for which credit was being sought, known as "power booking".

6.      Drive made loans to plaintiff's customers.

7.      Defaults were incurred on a significant number of the loans.

8.      Plaintiff incurred losses when a customer defaulted on a loan made by Drive because it was required to repurchase the vehicle or repay Drive for misrepresenting the value of equipment, being in most cases the difference between what Drive financed and the actual equipment on a vehicle.

9.      In 2007, after a significant number of claims came in from Drive, plaintiff requested the Dearborn Police to investigate, which resulted in the arrest and prosecution of Sinishtaj.

10.     Sinishtaj participated in a criminal diversion program and has invoked the privilege against self-incrimination.

11.     Sinishtaj is unavailable as a witness to her intentions.

12.     Plaintiff made a claim under the "Employee Dishonesty" endorsement of the policy issued by defendant to plaintiff, seeking to recover at least $248,284.44 it paid to Drive.

13.     Defendant denied the claim.

14.     The policy provides coverage for the losses due to employee Sinishtaj's dishonesty.  See attached brief.

15.     This case may be decided as a matter of law because there are no further factual developments that can affect the outcome.

16.     Counsel for plaintiff conferred with defense counsel but did not obtain concurrence with the relief sought.

WHEREFORE, plaintiff Superior Buick GMC, through its attorney John C. Kaplansky, respectfully asks that this honorable court GRANT its motion for summary judgment.

 

s/ John C. Kaplansky_____
JOHN C. KAPLANSKY (P23354)
Attorney for Plaintiff
30200 Telegraph, Suite 440
Bingham Farms, MI 48025
(248) 258-9444 / (248) 258-5854
j.kaplansky@att.net

DATED:      July 14 , 2011

CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2011, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: MICHAEL F. CONDIT and DENNIS M. DOLAN.

s/John C. Kaplansky_____
JOHN C. KAPLANSKY
Attorney for Plaintiff

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SUPERIOR BUICK GMC,                          Case No. 4:10-cv-11641

      Plaintiff,                         Hon.  Mark A. Goldsmith

vs.

DISCOVER PROPERTY & CASUALTY,

      Defendant.

_____

ATTORNEY FOR PLAINTIFF              ATTORNEY FOR DEFENDANT
JOHN C. KAPLANSKY (P23354)          DENNIS M. DOLAN
30200 Telegraph, Suite 440         303 W. Madison, Suite 300
Bingham Farms, MI 48025            Chicago, IL 60606
(248) 258-9444 / (248) 258-5854    (312) 781-6641 / (312) 781-6630
j.kaplansky@att.net                dolan@litchfieldcavo.com

ATTORNEY FOR DEFENDANT
MICHAEL F. CONDIT (P38095)
 6905 Telegraph Road, Suite 215
Bloomfield Hills, MI 48301-3159
(248) 645-5205 / (248) 645-0917
mfcondit@aol.com

_____

## PLAINTIFF'S AMENDED MEMORANDUM OF LAW
## IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.............................................................................. vi

STATEMENT OF ISSUE(S) PRESENTED ............................................... vii

STATEMENT OF MOST CONTROLLING AUTHORITY ...................... viii

STATEMENT OF FACTS .................................................................................. 1

ARGUMENT I

    THE POLICY PROVIDES COVERAGE FOR THE LOSSES DUE TO SINISHTAJ'S DISHONESTY. ...................................................................... 17

        (a) Sinishtaj committed "dishonest acts." ......................................... 17

        (b) Sinishtaj actions satisfy the "manifest intent" requirement. ....................................... 18

            i.    An employee's "manifest intent" may be inferred from his actions. ................. 18

            ii.    The Sixth Circuit applies the "substantial certainty" standard. ...................... 19

            iii.    "Substantial certainty" can be inferred under conditions similar to those of the present case. ................................................................. 21

            iv.    Sinishtaj's actions indicated a "reckless disregard" that constituted a "substantial certainty" that harm would result. .............................................. 25

        (c) Sinishtaj's action satisfy the "financial benefit" requirement. .................................... 26

RELIEF REQUESTED.................................................................................... 29

# INDEX OF AUTHORITIES

**Cases**

Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc., 854 A.2d 278 (N.J. 2004) ............. passim

Boston Securities, Inc. v. United Bonding Ins. Co., 441 F.2d 1302 (8th Cir. 1971) ................. 5, 6

Dewitt Bldg. Co., Inc. v. Auto-Owners Ins. Co., No. 235536, 236945 (Mich. Ct. App., June 12, 2003) ................................................................................................. 14, 15

FDIC v. Nat'l. Union Fire Ins. Co., 205 F.3d 66 (2nd Cir. 2000) .......................................... 12, 13

FDIC v. St. Paul Fire & Marine Insurance Co., 942 F.2d 1032 (6th Cir.1991) .............................. 8

First Nat. Bank of West Hamlin v. Maryland Cas. Co., 354 F. Supp. 189 (S.D. W.Va. 1973) ................................................................................................................. 5, 6

First Nat'l. Bank of Louisville v. Lustig, 961 F.2d 1162 (5th Cir. 1992) ............................... 11, 12

General Analytics Corp. v. CNA Ins. Cos., 86 F.3d 51 (4th Cir. 1996) ....................................... 15

Gonzalez Design Engineering, Inc. v. Citiens Ins. Co., No. 287413 (Mich. App. 1997), 1997 WL 33350547 ............................................................................................... 15

Oxford Bank & Trust v. Hartford Accident & Indem. Co., 698 N.E.2d 204 (Ill. Ct. App. 1998) ............................................................................................................... 13

Peoples Bank & Trust Co. v. Aetna Cas. & Sur. Co., 113 F.3d 629 (6th Cir.1997) ................. 7, 8

Phillip R. Seaver Title Co., Inc. v. Great American Ins. Co., No. 08-CV-11004 (E.D. Mich., Sept. 30, 2008) ........................................................................................... 9

**Statutes**

Mich. Comp. L. Ann. § 750.219f(1) ............................................................................................ 2

**Other Authorities**

Christopher Kirwan, Mischief or "Manifest Intent"? Looking for Employee Dishonesty in the Uncharted World of Fiduciary Misconduct, 30 Tort & Ins. L.J. 183 (Fall 1994) ........... 5, 6

Michael Keeley, Employee Dishonesty Claims: Discerning the Employee's Manifest Intent, 30 Tort & Ins. L.J. 915 (Summer 1995) .................................................................... 6, 7

Toni Scott Reed, Employee Theft Versus Manifest Intent: The Changing Landscape of Commercial Crime Coverage, 36 Tort & Ins. L.J. 43 (2000) ....................................................... 5

## STATEMENT OF ISSUE(S) PRESENTED

**WHERE AN EMPLOYEE'S DISHONESTY BENEFITS THE EMPLOYEE WHILE CAUSING THE EMPLOYER TO INCUR LOSSES UNDER A CONTRACT, DOES A "EMPLOYEE DISHONESTY" POLICY PROVIDE COVERAGE?**

### STATEMENT OF MOST CONTROLLING AUTHORITY

Plaintiff relies primarily on <u>Peoples Bank & Trust Co. v. Aetna Cas. & Sur. Co.</u>, 113 F.3d 629 (6th Cir.1997) and <u>Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc</u>., 854 A.2d 278 (N.J. 2004).

## STATEMENT OF MATERIAL FACTS

Background and parties

| | | |
|---|---|---|
| 1. | Superior Pontiac Buick GMC, Inc. ("Superior"), is a Delaware corporation with its principal place of business in Dearborn, Michigan. | Complaint, ¶1 |
| 2. | Superior is a dealer in new and used motor vehicles. | Complaint, ¶5 Cohen deposition, pp. 11, 15 |
| 3. | Superior also does business under the name "Superior Nissan." | www.dleg.state.mi.us/bcs_corp |
| 4. | Until June of 2008, Michael Cohen was the Nissan sales manager/general manager at Superior Pontiac. | Cohen deposition, p. 11. |
| 5. | Superior's used car department is part of "Superior Nissan." | Schwartz deposition, p. 106 |
| 6. | Superior has four different buildings, including two sales departments. | Schwartz deposition, p. 12 |
| 7. | "Superior Nissan" operated at the sales building at 15101 Michigan Avenue. | Schwartz deposition, p. 44 |
| 8. | Walter Schwartz has been president of Superior since 1983 and "generally oversee[s]" operations." | Schwartz deposition, p. 12, 13. |
| 9. | In 2007-2008, Superior had over 100 employees. | Schwartz deposition, pp. 64, 111 |
| 10. | Discover Property & Casualty Insurance Company ("Discover")  is an Illinois corporation. | Complaint, ¶2. |
| 11. | Michigan Auto Dealers Self-Insured Fund ("MADSIF") is "dealer owned group self-insured workers' compensation fund organized and operated" by Michigan motor vehicle dealers. | www.madsif.com |
| 12. | MADSIF is an assumed name for DSI Holdings, LLC | www.dleg.state.mi.us/bcs_corp. |
| 13. | DSI Holdings, LLC does business under the name "Auto Dealers Risk Solutions," an insurance agency that sells insurance to motor vehicle dealers. | www.auto-dealers-risk-solutions.com/ |
| 14. | Maury B. Feuerman is the president of Auto Dealers Risk Solutions | www.auto-dealers-risk-solutions.com [5/6/11] |
| 15. | Jerry McAndrews is president of DSI Holdings, LLC | www.auto-dealers-risk-solutions.com [5/6/11] |
| 16. | Santander Consumer USA Inc. was formerly known as Drive Consumer USA, Inc. and changed its name to Santander Consumer USA Inc. in 2007. | www.investing.businessweek.com [4/30/11] |
| 17. | Santander Consumer USA Inc. acquires installment | www.investing.businessweek.co |

| | | |
|---|---|---|
| | contracts principally from manufacturer-franchised dealers in conjunction with sale of used and new automobiles, and light duty trucks to borrowers. It also engages in purchasing, securitizing, and servicing automobile retail installment contracts through a network of dealer partners in the United States. | m [4/30/11] |
| 18. | Santander Consumer USA Inc. is owned by Banco Santander Centro Hispano SA (STD), a Spanish corporation | www.sec.gov |
| 19. | The headquarters of Santander Consumer USA Inc. are in Dallas, Texas. | www.santanderconsumerusa.com |
| 20. | Santander Consumer USA Inc., doing business as "Drive" or "Drive Financial," operates as a specialized consumer finance company. | www.investing.businessweek.com www.santanderconsumerusa.com [4/30/11] |
| 21. | Drive specialized in subprime credit. | Cohen deposition, p. 24. |
| 22. | Drive had three local representatives.  They "had different reps coming in all the time." | Schwartz deposition, pp. 59, 100. Sinishtaj deposition, p. 30. Sinawi deposition, pp. 43, 60. |
| 23. | Superior dealt with "25-30" Drive representatives. | Pope deposition, p 38. |
| 24. | Trent Kleibring was from Drive Financial. | Muscat deposition, p. 13 Schwartz deposition, pp. 30, 77. |
| 25. | Schwartz started dealing with Drive in 2001. | Schwartz deposition, p. 109. |
| 26. | Drive did the bulk of Superior's used car financing. | Cohen deposition, p. 24. Sinawi deposition, pp. 31-32. |
| 27. | Drive "bought a lot of bad credit."  "They would take anybody . . . [a]ny dealership in Michigan that was doing special finance, they were probably using [Drive] 75 percent of the time." | Sinawi deposition, p. 32. |

Superior's staff

| | | |
|---|---|---|
| 28. | From approximately June of 2005 until February of 2008, Lilana ("Lila") Sinishtaj was employed at Superior Nissan. | Sinishtaj deposition, pp. 9, 14 Schwartz deposition, p. 25. |
| 29. | Sinishtaj was "in the finance department." (Schwartz deposition, p. 25.)  She was "the booking officer for booking loans" or the "business manager," "finance manager." | Schwartz deposition, p. 25 Muscat deposition, p. 8. Cohen deposition, pp. 15, 17. Sinawi deposition, p. 18. Pope deposition, p. 14. |
| 30. | Sinishtaj "was in the special finance department." | Sinishtaj deposition, pp. 10, 12. |

|   | Her job was to "[s]ecure financing for credit-challenged people . . ." "That was supposedly her area of expertise." | Schwartz deposition, pp. 25, 26. Cohen deposition, p. 16. Sinawi deposition, pp. 18, 25, 26. |
|---|---|---|
| 31. | Sinishtaj's job was "to get all used car customers who weren't paying cash financed . . ." | Cohen deposition, p. 17. |
| 32. | "Credit-challenged" meant people who "couldn't obtain standard financing," "[p]eople with less than good credit. | Schwartz deposition, pp. 25, 26. Cohen deposition, p. 16. |
| 33. | Sinishtaj "input credit applications," submitted them to the bank and "got deals approved." | Sinishtaj deposition, p. 10. Schwartz deposition, p. 26. Cohen deposition, p. 17. |
| 34. | Sinishtaj primarily handled financing of used cars, although not exclusively. | Schwartz deposition, p. 44. Cohen deposition, p. 16. |
| 35. | George Sinawi was the used car manager at Superior.  He started working there in July of 2005. | Sinishtaj deposition, pp. 15, 18, 29 Schwartz deposition, p. 27. Cohen deposition, p. 15. Sinawi deposition, pp. 12, 14-15. |
| 36. | Sinawi talked to the Drive representatives, but Sinishtaj was their primary contact. | Sinawi deposition, p. 60. |
| 37. | Sinawi hired Sinishtaj.  She, together with several salesmen, left another dealership where Sinawi had worked that was "just a mess." | Sinishtaj deposition, p. 29. Schwartz deposition, p. 27. Sinawi deposition, pp. 18-19. |
| 38. | Sinishtaj worked with Sinawi, "as a team pretty autonomously."  Sinishtaj "did her own thing." | Cohen deposition, p. 16. Sinawi deposition, p. 24. |
| 39. | Jacqueline Lavette-Pope was an employee of Superior Nissan. | Pope deposition, p. 10. |
| 40. | Pope's position was as "assistant finance." Sinishtaj was "one of" her supervisors. | Pope deposition, pp. 11, 14, 26. Cohen deposition, p. 19. |
| 41. | Pope's job was primarily to obtain documents from customers and send "paperwork" to the bank. | Pope deposition, pp. 11-12, 27-28. |
| 42. | Pope did not submit applications for credit. | Pope deposition, p. 13. |
| 43. | Sinishtaj and Sinawi worked at the Nissan building. | Sinishtaj deposition, pp. 28-29. Cohen deposition, p. 15. Sinawi deposition, p. 12. |

The policy

|   |   |   |
|---|---|---|
| 44. | In November of 2006, Superior purchased an insurance policy through a local dealer, Marvin Tamaroff. | Schwartz deposition, p. 15 |

- 3 -

| | | |
|---|---|---|
| 45. | The policy was issued by Discover. | Complaint, ¶7. |
| 46. | The policy number was D121P50010 ("the policy") | Exhibit A, Commercial Crime Coverage Part of Policy Number D121P50010 |
| 47. | The policy included an "Employee Dishonesty Coverage Form." | Exhibit  A. |
| 48. | Schwartz discussed the policy at the time he bought it. | Schwartz deposition, p. 20 |
| 49. | Schwartz would have discussed the Employee Dishonesty Coverage with the representative because he "always had employee dishonesty insurance, and . . . would have never bought a policy that didn't have it." | Schwartz deposition, pp. 20, 21-22, 110, 111 |
| 50. | Schwartz dealt with Kurt Zimmerman, the account executive. | Schwartz deposition, pp. 21-22. |
| 51. | Zimmerman told Schwartz that "that it was great coverage, great company, and I would be covered" for employee dishonesty," "[i]ndividuals who hurt the company did something wrong." | Schwartz deposition, pp. 22, 23, 24 |
| 52. | Schwartz paid for the insurance through MADSIF. | Schwartz deposition, p. 110. |
| 53. | The policy provided "We will pay for loss of and loss from damages to, Covered property resulting directly from the Covered Cause of Loss." | Exhibit A, A.2 |
| 54. | The policy defined "Covered property" as "Money", "securities" and "property other than money and securities" | Exhibit A, A.2(1) |
| 55. | The policy defined "Covered Cause of loss" as "Employee dishonesty". | Exhibit A, A.2(2) |
| 56. | The policy provided: | Exhibit A, D.3.a |
| 57. | **"Employee Dishonesty"** in paragraph A.2 means only dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons, except you or a partner, with the manifest intent to: | |
| | (1)   Cause you to sustain loss; and also | |
| | (2)   Obtain financial benefit (other than employee benefits earned in the normal course of employment, including:  salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions) for: | |

                  (a)      The "employee"; or

58.     (b)      Any person or organization intended by the "employee" to receive that benefit.

<u>Car sales and loans</u>

| | | |
|---|---|---|
| 59. | When a customer came to the Superior showroom, he would be assigned to a salesman, who would question him about what kind of vehicle he wanted and how much he could pay for it. | Schwartz deposition, p. 45, 46 |
| 60. | The customer was then referred to a "finance person," sometimes referred to as a loan officer. | Schwartz deposition, pp. 45-46. |
| 61. | In a "special finance situation," the bank determined how much it would finance for the customer, which would determine "which cars on the lot would fit." Sinishtaj would "find out how much the bank would lend." | Cohen deposition, pp. 30-31. Sinawi deposition, pp. 24-25. |
| 62. | The customer would complete a credit application. | Schwartz deposition, p. 46. Sinawi deposition, pp. 24-25. |
| 63. | The salesman or the loan officer would obtain a credit report. | Schwartz deposition, p. 46. |
| 64. | The loan officer "would determine the documentation or what we call stips that the given bank would require . . ." | Schwartz deposition, p. 46. |
| 65. | The loan officer would submit the application by computer. They used a system called "Dealer Track" that went to multiple financing sources. | Schwartz deposition, p. 47. Sinawi deposition, pp. 14, 42. Pope deposition, p. 28. |
| 66. | The sales price was not determined until the credit application was approved. | Sinawi deposition, p. 54. |
| 67. | Sinishtaj submitted the applications to Dealer Track. | Sinawi deposition, pp. 25, 26, 42. Pope deposition, pp. 28-29. |
| 68. | There was no requirement that the application be reviewed by anyone else at Superior before it was submitted. | Schwartz deposition, p. 47. Sinawi deposition, pp. 26-27. |
| 69. | The loan officer would send the application to "a number of different institutions," "two or three banks . . . see which one would be . . . receptive." | Schwartz deposition, pp. 47, 84, 88. Sinawi deposition, p. 57. |
| 70. | The application included the VIN number and the options on that make and model vehicle. | Sinawi deposition, p. 56. |
| 71. | If a loan was accepted, "you get approval in three | Sinawi deposition, pp. 27-28. |

minutes."

| | | |
|---|---|---|
| 72. | "Probably 15 percent" of the poor credit applications were approved. | Sinawi deposition, p. 27. |
| 73. | The banks would respond and Superior would decide which offer to accept, considering the potential profit and loan conditions. | Schwartz deposition, p. 89. Sinawi deposition, p, 57. |
| 74. | The price of the vehicle was determined by what the bank would lend on it.  "[G]etting approved was 99 percent of thing.  Once we got the customer approved, whatever the bank allowed us to get was the sales price."  Whichever bank would lend the largest amount on a vehicle got the loan. | Sinawi deposition, pp. 54, 55, 56. |
| 75. | The amount the dealership requested financing for was based on the value of the vehicle.  It was determined by "[w]hoever submitted the deal." | Sinawi deposition, pp. 56-57. |
| 76. | There was a 30% commission on every vehicle sold. | Schwartz deposition, p. 74. Sinawi deposition, p. 59. |
| 77. | The 30% commission was divided equally, 15% of the gross profit to the salesman and 15% to the finance department/loan officer. | Schwartz deposition, pp. 74-75, 80-81. Sinishtaj deposition, pp. 20-21, 30 Sinawi deposition, p. 58. |
| 78. | The profit on a vehicle was based on the dealership's purchase price, its repair costs and the selling price. | Sinawi deposition, p. 57. |
| 79. | The dealership's profit was computed after the commissions were paid to the sales people and the finance officer. | Sinawi deposition, p. 59. |
| 80. | Sinawi also made a 6% commission on every sale. | Sinawi deposition, p. 58. |

The fraud

| | | |
|---|---|---|
| 81. | Sinishtaj was paid solely on commission, 15% for "[e]very car she was involved in  financing." | Schwartz deposition, p. 53. Sinawi deposition, pp. 51-52. |
| 82. | Increasing the value of the vehicle increased Sinishtaj's commission. | Sinawi deposition, pp. 52, 53. |
| 83. | "Power booking" is "embellishing the equipment on a vehicle to make it show a greater value," "intentionally lying on [a credit] application about equipment on a vehicle . . .[t]o inflate the price of the vehicle on paper."  "[I]t means overstating the equipment or the model of a type of used vehicle to | Schwartz deposition, p. 56. Muscat deposition, p. 53. Cohen deposition, pp. 20, 21. Sinawi deposition, pp. 28, 29. Pope deposition, pp. 30, 34. |

increase its loan value."  "The purpose is to enhance the value to the lender so that greater amounts of money would be improved [*sic*] for purchase by the customer. . . the lender would approve a larger amount . . . to be financed." "[A]dding options to a vehicle that's not there. . . [w]hen they're submitting" an application to the finance company."  The goal is "[t]o try to get as much money from the bank as possible . . . [t]ry to get as much financed as possible."  "[I]t helps" get a loan approved but it is "not a guarantee."  It makes the loan "seem more attractive to the bank."

| | | |
|---|---|---|
| 84. | "Power booking" is alleged to be widespread in the industry.  It occurs "[o]nce in a while." | Muscat deposition, pp. 53, 58. Sinawi deposition, pp. 40, 47. |
| 85. | When completing credit applications, Sinishtaj repeatedly engaged in "power booking." | Muscat deposition, pp. 9-10. |
| 86. | Sinawi became aware of Sinishtaj's "power booking" "on occasion," after the fact. | Sinawi deposition, pp. 29-30, 31, 43-44. |
| 87. | The extent of Sinishtaj's alleged "power booking" was not common. | Sinawi deposition, p. 40. |
| 88. | | |
| 89. | Sinishtaj altered customers' credit applications with correction fluid, to make it appear that their income was greater than it was. | Muscat deposition, pp. 24, 25. Exhibit E, City of Dearborn Police Department report no. 0800001239 |
| 90. | Sinishtaj was the only employee who could have entered the data in the computer system. | Schwartz deposition, p. 104. |
| 91. | Sinishtaj altered pay stubs submitted by customers. | Muscat deposition, p. 24 |
| 92. | Sinishtaj falsified pay stubs for some customers. | Muscat deposition, pp. 25, 26. |
| 93. | The altered credit applications and pay stubs were submitted to Drive Financial while the original applications and pay stubs were retained in Superior's files. | Muscat deposition, pp. 24-27. Schwartz deposition, p. 108. |
| 94. | Sinishtaj's actions increased the value of the vehicle to the finance company. | Schwartz deposition, p. 55. Sinawi deposition, p. 29. |
| 95. | Some of Sinishtaj's action were "[not] about the profit."  "[S]ome of these deals . . . we didn't even make money one."  "[W]e did it . . . to the another car . . to build referrals . . ." | Sinawi deposition, pp. 52, 57-58. |
| 96. | The dealership also made profits on warranties and service business. | Sinawi deposition, p. 57. |
| 97. | Sinishtaj got "a base commission of $50 either | Sinawi deposition, pp. 52, 58. |

way."

| | | |
|---|---|---|
| 98. | Drive dealt with Sinishtaj. | Sinawi deposition, p. 43. |
| 99. | Drive's representatives "said [Sinishtaj] was doing great, she was their top dealer." "I had rav[e] reports on her." Sinishtaj "was like the third largest this side of the country." | Schwartz deposition, pp. 59, 60, 101. |
| 100. | Drive's employees were paid on commission. "They were paid for every contract put in." | Schwartz deposition, p. 101. Sinawi deposition, p. 37. |
| 101. | Drive's representative "came in to help [Sinishtaj]." | Schwartz deposition, p. 60 |
| 102. | So-called "held offerings," i.e., loans not paid by the bank, created a "cash flow" problem. "[I]f something's bad on the deal, if she's missing something or somebody brought in something that was wrong," "we don't get our money from the bank." | Schwartz deposition, p. 87. Sinawi deposition, p. 37. |
| 103. | Schwartz held weekly meetings with the staff where he told them to "represent everything properly, have the proper documentation," to avoid "anything that would slow down a contract . . ." | Schwartz deposition, pp. 58-59, 62. |
| 104. | Schwartz had staff meetings where he told the employees to "watch the deals," because "[t]here was some bad deals coming through." "There was deals out there that couldn't get financed." "[I]f you have eight deals out there at $15,000 each, you've got $100,000 cash out there. And then, you know, we'll have a meeting." | Sinawi deposition, pp. 37, 38, 39. |
| 105. | If there were problems with four or five deals not funded, "it will be a quick meeting." There could not have been as many as 20 to 25 deals. "Twenty to twenty-five deals is impossible because they would be looking at, you know, 300,000, 400,000 cash out there and that would never be allowed to happen." | Sinawi deposition, p. 39. |
| 106. | "Power booking" was not discussed at staff meetings. | Sinawi deposition, pp. 37, 40. |

### Discovery of the fraud

| | | |
|---|---|---|
| 107. | There could be a substantial lapse of time before the "power booking" was revealed. | Sinawi deposition, pp. 30, 47. |
| 108. | "Power booking" is not discovered by the financing institution unless the vehicle is inspected after sale. "[T]he only time they know anything is when they [the vehicles sold] [are] repossessed or they're totaled." | Schwartz deposition, pp. 105-106. |
| 109. | Under its contract with Drive, Superior was | Exhibit B, Drive Financial |

| | | |
|---|---|---|
| | required to warrant that "credit information supplied by Dealer as to the Buyer(s) is true, complete and accurate . . ." | Services Non-Recourse Dealer Retail Agreement [Michigan], §7(F). |
| 110. | Under its contract with Drive, Superior was required to warrant that "The Vehicle and all options therein are accurately described in the Contract . . ." | Exhibit B, Drive Financial Services Non-Recourse Dealer Retail Agreement [Michigan], §7(I). |
| 111. | If Drive financed a vehicle for a higher amount than it was worth, the dealer was "charged back" for the difference. | Sinawi deposition, pp. 44, 45. Pope deposition, pp. 15, 31-32, 32-33. Exhibit B, Drive Financial Services Non-Recourse Dealer Retail Agreement [Michigan], §9(A). |
| 112. | If a vehicle was repossessed and auctioned off, the dealership would be "charged back" the difference in value. | Sinawi deposition, pp. 43-44. Exhibit B, Drive Financial Services Non-Recourse Dealer Retail Agreement [Michigan], §9(A). |
| 113. | If the salesperson was still available, he or she would be liable for the charge back, but "most of the time, it's usually just gone." | Sinawi deposition, p. 45. |
| 114. | Sometimes a charge back would result in the dealership's making no profit on a sale, or taking a loss on it.  "[W]hen the owner's losing money, putting money out of his pocket on a deal that should have never been on the road, that's when you run into issues." | Sinawi deposition, pp. 65-66. |
| 115. | If the vehicle simply sold for less than its stated value, Drive took the loss. | Sinawi deposition, p. 44. |
| 116. | Kleibring (from Drive) believed that "a large number of fraudulent loans [were] being generated" by Superior.  He had "54 separate files on fraudulent loans." | Muscat deposition, pp. 13, 14. |
| 117. | Schwartz found out about Sinishtaj's "power booking" from "Trent [Kleibring]" at Drive Financial.  "[S]ome paperwork . . . was misrepresented," "cars . . . and people that were misrepresented."  "The equipment on the cars were embellished, and they were stated that there was equipment that wasn't on the cars." | Muscat deposition, p. 42. Schwartz deposition, pp. 30, 31-32, 77. |
| 118. | "[Kleibring]" "stated that a third-party . . . looked at the car,"  which "substantiated" the claims to | Schwartz deposition, pp. 33, 34. |

|     | Schwartz. Drive "had repossessed [the cars] and they inspected and the equipment wasn't there and they said they were short equipment." | |
| --- | --- | --- |
| 119. | Drive did not identify who was making the misrepresentations. | Schwartz deposition, p. 35. |
| 120. | Drive Financial required Superior to repay the difference in value between the vehicles as described in the applications and the vehicle as it was sold. "They made a demand" for the value of the equipment, in the form of a series of identical letters. | Schwartz deposition, pp. 30, 32, 33, 34, 96. Cohen deposition, p. 25. |
| 121. | The "charge backs" began about 2007. | Sinawi deposition, pp. 30, 32. |
| 122. | Pope learned of some of the "charge-backs" via faxes to the dealership, which she gave to Schwartz. | Pope deposition, p. 33. |
| 123. | By January of 2008, there were an unusual number of "charge backs." "It was a big number." | Sinawi deposition, pp. 47, 49. Pope deposition, pp. 15, 16, 18. |
| 124. | Sinishtaj was still employed at the time. | Sinawi deposition, p. 47. |
| 125. | Superior was also required to "buy back some contracts" from Drive Financial. If "something doesn't come out right," Drive would "just send the contract back." Superior would then replace the contract or resell the car. "[T]he dealership would write a check to the bank back to them and . . . it would be our responsibility to either get the car back or try to find a different way to find financing for them." | Schwartz deposition, pp. 30, 88, 89-90. Sinawi deposition, p. 45. |
| 126. | If the dealership had to repossess or refinance a vehicle, it suffered a loss, "just to make the customer happy." | Sinawi deposition, pp. 46-47. |
| 127. | Schwartz did not investigate the source of the misrepresentations, because "I had no way to do it." | Schwartz deposition, pp. 32, 35, 36. |
| 128. | In 2009, Superior stopped paying the demands from Drive. | Schwartz deposition, pp. 34-35, 112. |
| 129. | Drive temporarily suspended dealing with Superior. | Pope deposition, p. 21. |
| 130. | Schwartz went to the Dearborn police department. By that point, Schwartz had realized that "it was no longer an honest mistake." | Schwartz deposition, pp. 35-36, 39, 110. Muscat deposition, pp. 5-6 Dearborn police report |
| 131. | Schwartz's complaint was investigated by a Dearborn police detective, Kenneth Muscat, who specialized in "major crime investigations." | Muscat deposition, pp. 4, 6. |

| | | |
|---|---|---|
| 132. | Sinawi learned of the investigation from a friend of Sinishtaj's. | Sinawi deposition, p. 20. |
| 133. | Sinishtaj left Superior "by mutual agreement" during the course of the investigation. "The Dearborn Police Department asked me not to change anything up until their investigation was over, and at the point that it was getting to that point, it was mutual." Schwartz did not know if the investigation was complete at the time Sinishtaj left. | Sinishtaj deposition, p. 13. Schwartz deposition, pp. 28, 29 |
| 134. | Sinishtaj had not been charged with a crime at the time she left. | Schwartz deposition, p. 29. |
| 135. | Sinawi left Superior on January 14, 2008, by "mutual" agreement. He left to take advantage of an opportunity at another dealership, but "it got pulled about three months" later. | Schwartz deposition, p. 27. Sinawi deposition, pp. 17, 36, 49. |
| 136. | At Muscat's request, Schwartz brought Superior's files for the 54 loans deemed suspicious by Kleibring to the police department. | Muscat deposition, p. 15. |
| 137. | Muscat later determined that 33 pay stubs in the 54 suspicious files were either incorrect or counterfeit. | Muscat deposition, pp. 15-16, 17-19, 49. |
| 138. | Muscat interviewed several of the loan applicants, who indicated that they had signed credit applications but did not complete them. | Muscat deposition, pp. 19-22. |
| 139. | Some descriptions of the loan officer matched that of Sinishtaj. | Muscat deposition, p. 20. |
| 140. | Muscat took a computer from Superior and had it examined by an in-house forensic computer expert at the Dearborn Police Department, but there was nothing suspicious on the computer. | Muscat deposition, p. 16. |
| 141. | Muscat submitted a warrant request, based on the evidence from nine of Superior's files. | Muscat deposition, p. 28. |
| 142. | An assistant Wayne County prosecutor authorized a warrant for the arrest of Sinishtaj. | Muscat deposition, pp. 50-51. |
| 143. | Sinishtaj was arrested on September 17, 2008. | Muscat deposition, p. 29 Sinishtaj deposition, pp. 21-22 |
| 144. | Muscat was suspicious of Sinawi, but he was not charged or arrested. | Muscat deposition, p. 52. |

| | | |
|---|---|---|
| 145. | Sinishtaj was charged with nine courts of forwarding unauthorized credit applications, a felony[1]. | Muscat deposition, p. 6. |
| 146. | Sinishtaj admitted "to power booking loans all the time and says it's a common practice, and that if that's what she's charged with, she's guilty." | Muscat deposition, p. 32. |
| 147. | Sinishtaj denied "making any bogus pay stubs or submitting any bogus loan applications." | Muscat deposition, p. 32. |
| 148. | Schwartz learned from the police that Sinishtaj fraudulently enhanced people's qualifications for a loan" by altering pay stubs. | Schwartz deposition, p. 32. |
| 149. | The investigation did not result in anyone else's being charged with a crime. | Schwartz deposition, pp. 47-48. |
| 150. | Sinishtaj was placed into a diversion program. | Sinishtaj deposition, pp. 22-23. Muscat deposition, pp. 30-31, 48 |
| 151. | The case against Sinishtaj was dismissed in April of 2010 and the record of her arrest was expunged. | Muscat deposition, p. 31. Sinishtaj deposition, pp. 22-23. |
| 152. | As part of the diversion program, Sinishtaj was supposed to make restitution to Superior. Schwartz did not participate in the restitution agreement. | Muscat deposition, p. 32. Schwartz deposition, pp. 65-66. |
| 153. | Sinishtaj paid Superior $20,000. Schwarz was told by an unidentified assistant prosecutor that $20,000 had been paid by Sinishtaj's father and that was all he would receive. | Exhibit C, checks. Schwartz deposition, pp. 66, 67. |
| 154. | Sinishtaj filed for bankruptcy protection under 11 U.S.C. Chapt. 7. | Sinishtaj deposition, p. 25 Schwartz deposition, p. 67. United States Bankruptcy Court for the Eastern District of Michigan, Docket no. 2:10-BK-40754. [2] |
| 155. | Superior Pontiac was listed as a creditor in Sinishtaj's bankruptcy petition, but there were no adversary proceedings. | Schwartz deposition, p. 68. |
| 156. | Superior repaid Drive $248,284.44. | Schwartz deposition, p. 105. |
| 157. | Some of the Drive loans were later refinanced. | Schwartz deposition, pp. 86-87. Pope deposition, p. 17. |
| 158. | Drive sued Superior on August 11, 2010, seeking "in excess of $300,000." | Schwartz deposition, pp. 50, 112. *Santander Consumer USA Inc v.* |

---

[1] Mich. Comp. L. Ann. § 750.219f(1).

[2] No discharge date appears in the docket.

|  |  | *Superior Pontiac Buick GMC, Inc.*, United States District Court for the Eastern District of Michigan case no. 2:10-cv-13181, filed August 11, 2010 and assigned to Judge Nancy Edmunds |
|---|---|---|
| 159. | Superior suffered additional losses, because "a lot of these cars were six-year financing. . ."  "When you have a contract that's a five- or six-year contract, they might repossess the car two or three years later, so it became apparent later." | Schwartz deposition, pp. 105, 109. |

Coverage dispute

| 160. | Schwartz made a claim under the policy.  "[I]t became apparent to me that I had coverage."  "At some point" a claim was submitted. | Schwartz deposition, pp. 35, 42, 112. |
|---|---|---|
| 161. | Schwartz called Feuerman. They had two or more conversations and two meetings.  "I wanted to make him aware of the potential claim that was there and what had happened. | Schwartz deposition, pp. 38-41. |
| 162. | Schwartz "was waiting for the police investigation and then I would know what the situation was." | Schwartz deposition, pp. 41. |
| 163. | During a meeting with Feuerman and Jerry McAndrew, Schwartz was informed that the claim had been denied "because investigation was not complete." | Schwartz deposition, pp. 41, 42. |

The coverage issue

| 164. | On August 20, 2008, Paul Kilmer of Gallagher Bassett Services, Inc., sent a message to Kent Baldwin, indicating there was a "coverage question" under the policy.  "I did not conceive that there is a manifest intent for her to cause a loss." | Exhibit D, correspondence, p. DPC 093. |
|---|---|---|
| 165. | On September 19, 2008, Kilmer and Baldwin sent an e-mail message to Kevin M. Bresnahan, requesting a "formal coverage position," because "[w]e do not feel this is covered under the policy of insurance as there is no manifest intent of the involved employee to receive funds from the dealership that she was not entitled." | Exhibit D, correspondence, p. DPC 033. |
| 166. | The September 19, 2008, letter claimed that: | Exhibit D, correspondence, p. DPC 035. |
|  | (1)      In this particular scheme the |  |

principal [Sinishtaj] did not steal
funds from the dealership, rather she
was allegedly altering loan
applications in order to secure higher
loan amounts to qualify the
purchaser for a loan.  She would
earn her commission from each sale
and the dealership would earn its
profit from the sale of each vehicle.

| | | |
|---|---|---|
| 167. | On September 26, 2008, Kilmer wrote (via e-mail) to Bresnahan and  Baldwin that "I . . . think with the amount of funds incurred, the matter will be litigated (from my recent call from Walter [Schwartz], he makes that clear)." | Exhibit D, correspondence, p. DPC 028. |
| 168. | Later on September 26, 2008, Kilmer authorized Bresnahan to send a letter denying coverage under the policy. | Exhibit D, correspondence, p. DPC 049 |
| 169. | In a letter dated September 29, 2008 from Kevin Bresnahan to Walter Schwartz, Bresnahan stated that Discover  was "unable to issue a formal coverage position at this time."   The letter continued: | Exhibit D, pp. DPC 066-068. |

(1)     However, DP&C can generally state,
based upon the information
provided, that the aforementioned
policies do not contemplate coverage
for the losses described by Drive.
DP&C's assessment of coverage is
based upon the following provisions
of the applicable policy(ies):

(2)     A 1-3

(3)     D 2.a

(4)     D 3

(5)     The acts alleged to have been
committed by the Superior employee
were not intended to cause Superior
loss, and therefore do not meet the
definition of "Employee Dishonesty"
set forth above.  Consequently, the
aforementioned policies would not
provide coverage to Superior for the
claims as reported.  Additionally, in
accordance with Section D(2) set
forth above, the policies were
cancelled as to Ms. Sinishtaj upon

|   | Superior's discovery of her purported dishonest acts. | |
|---|---|---|
| 170. | On September 30, 2008, there was an exchange of correspondence between Bresnahan and McAndrews. | Exhibit D, correspondence, p. DPC 025. |
| 171. | Discovery denied Superior's claim in a letter dated October 10, 2008 from Bresnahan to Schwartz: | Exhibit D, pp. DPC 061-062. |

    (1)    As discussed in the September 26, 2008, letter, the facts reported to date do not fall within the coverage afforded under the Employee Dishonesty Coverage Form. However, in the event that different or additional facts are presented that fall within [the coverage], the applicable limit of such coverage . . . is . . .

    (2)    The specific issues, policy language and grounds set forth in this letter are not intended to be, nor would they be interpreted as, a waiver of the right to reserve our right to deny coverage on these or any other grounds as further events or developments may warrant.  Any other claims, rights, causes of action, rights of action, defenses, positions or remedies possessed by DP&C are hereby expressly reserved.

|   |   |   |
|---|---|---|
| 172. | On November 7, 2008, Bresnahan made an entry in Discover's computer file: | Exhibit D, correspondence, p. DPC 076. |
| 173. | TPA [third-party administrator] submitted for coverage review – no coverage for Employee Dishonesty – this coverage contemplate [*sic*] an employee defrauding the insured, not a loss by a customer due to dishonest statement by employee. | |
| 174. | On December 22, 2008, counsel for Superior provided McAndrews with additional authority in support of its claim. | Exhibit D, correspondence, p. DPC 020. |
| 175. | Discover reviewed the additional authority but did not change its position. | Exhibit D, correspondence, pp. DPC 018-020. |
| 176. | Discover closed its file on the Superior claim no later than August 20, 2008. | Exhibit D, correspondence, p. DPC 074. |

| | | |
|---|---|---|
| 177. | Superior filed suit on April 22, 2010. | Docket entry #1. |

Damages

| | | |
|---|---|---|
| 178. | Superior incurred over $300,000 in losses as a result of Sinishtaj's actions. | Schwartz deposition, pp. 70-101, 113-114. |
| 179. | Fraudulent documents were used to remove vehicles that belonged to Superior. | Schwartz deposition, p. 108. |
| 180. | Sinishtaj's actions were intended to cause loss to Superior. | |
| 181. | Sinishtaj knew enough about the auto business to know that "charge backs" would cause a loss to the dealership. | Sinawi deposition, pp. 48, 63. |
| 182. | Sinishtaj knew enough about the auto business to know  that falsified employment documents would cause a loss to the dealership. | Sinawi deposition, pp. 48-49. |

## ARGUMENT I

## THE POLICY PROVIDES COVERAGE FOR THE LOSSES DUE TO SINISHTAJ'S DISHONESTY.

### (a)

### Sinishtaj committed "dishonest acts."

Any business that delegates authority to employees lives with the specter of employee dishonesty. Insurers have long recognized the threat posed by a trusted employee who is willing to trade fiduciary honor for personal gain. Over time the insurance industry has developed fidelity coverage to protect employers against the resulting risk of loss.

Christopher Kirwan, Mischief or "Manifest Intent"? Looking for Employee Dishonesty in the Uncharted World of Fiduciary Misconduct, 30 Tort & Ins. L.J. 183 (Fall 1994).

Insurance coverage for "employee dishonesty" dates, at the least, to the 1930's. Toni Scott Reed, Employee Theft Versus Manifest Intent: The Changing Landscape of Commercial Crime Coverage, 36 Tort & Ins. L.J. 43, 45 (2000).

First Nat. Bank of West Hamlin v. Maryland Cas. Co., 354 F. Supp. 189 (S.D. W.Va. 1973) illustrates what actions can constitute "dishonesty." The bank had a fidelity bond (see infra) that applied to "any loss through any dishonest, fraudulent or criminal act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss of Property through any such act of any of the Employees." The court found coverage under that language where a bank employee falsely reported that many new vehicles that were supposed to secure the bank's loans to an auto dealer were in stock when they had actually been sold.

Similarly, in Boston Securities, Inc. v. United Bonding Ins. Co., 441 F.2d 1302 (8th Cir. 1971), an employee falsified credit applications for a small-loan company and also received

"kick backs" from the applicants.  The company lost money on the loans.  The Eighth Circuit (although without reproducing the policy language in the opinion) found coverage under an insurance policy,.

In the case at hand, Sinishtaj both misrepresented the state of collateral to a third-party lender, like the employee in West Hamlin, and falsified credit applications like the loan officer in Boston Securities.  Actions like hers, then, have been found to be "dishonest" for purposes of insurance coverage.

**(b)**

**Sinishtaj actions satisfy the "manifest intent" requirement.**

***i.   An employee's "manifest intent" may be inferred from his actions.***

Since 1976, the insurance industry has employed a standardized "employee dishonesty" form in both commercial insurance policies and banker's "fidelity bonds," which are substantially identical.  Reed, *supra*, 36 Tort & Ins. L.J. at 45-46; Michael Keeley, Employee Dishonesty Claims: Discerning the Employee's Manifest Intent, 30 Tort & Ins. L.J. 915, 915-16 (1995).

Both types of policies incorporate a requirement of "manifest intent" to harm the employer.  "The 1976 definition emphasizes the two fundamental elements of employee dishonesty: 'intent to harm coupled with the intent to profit.'"  Id. at 46.

"The employee dishonesty coverage is perhaps one of the most widely litigated coverages . . ."  Kirwan, *supra*, 30 Tort & Ins. L.J. at 186.  Specifically, "the term 'manifest intent' has become the major battlefield in employee dishonesty coverage disputes."  Id.  It "has developed into one of the more complex issues in the context of analyzing the elements of an employee dishonesty claim."  Reed, *supra*, 36 Tort & Ins. L.J. at 55.

Courts have varied in their approaches to interpreting the term. Keeley, *supra*, summarized them. One is to "to limit coverage to embezzlement or embezzlement-type acts," by looking at "a person's obvious or overt purpose or design." 30 Tort & Ins. L.J. at 921. Other courts, however, "have concluded that the term does not require that the employee actively desire that the insured sustain a loss." Id. "These courts have found that the requirement is satisfied if the employee knew that a loss was substantially certain." Id. A third group of courts "have utilized what can only be considered a purely objective test, instructing the jury that 'a person is deemed to intend the natural consequences of his actions.'" Id.

> *Most cases considering the manifest intent issue* attempt to discern the employee's subjective state of mind by reviewing the objective manifestations thereof to determine whether he acted with manifest intent. These cases essentially *apply a subjective test, but one that necessarily contains an objective element.* They recognize that the search is to determine the employee's subjective state of mind, but that the search can be meaningful only by reviewing the employee's actions, words, and all surrounding circumstances.

Id. at 931 (emphasis supplied).

### ii.  The Sixth Circuit applies the "substantial certainty" standard.

The Sixth Circuit, following what appears to be the majority trend, has adopted the "substantial certainty" interpretation of "manifest intent."

Peoples Bank & Trust Co. v. Aetna Cas. & Sur. Co., 113 F.3d 629 (6th Cir.1997), grew out of a scheme by two bank officers to sell off a money-losing restaurant to one of the bank's commercial customers. It entailed misrepresentations to the Small Business Administration, which eventually sued the bank. After many interim developments, the dispute ended up as a declaratory judgment action between two insurers of the bank. The district court granted summary judgment to both of them and the bank appealed.

The policy language referred to "[l]oss resulting directly from dishonest or fraudulent acts of an Employee committed alone or in collusion with others." It went on to provide:

Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only dishonest or fraudulent acts committed by such Employee with the manifest intent

(a) to cause the insured to sustain such loss, and

(b) to obtain financial benefit for the Employee or for any other person or organization ... other than [financial benefits] earned in the normal course of employment.

113 F.3d at 633-34.

While the Sixth Circuit found no "manifest intent" to cause loss in People's Bank, it refused to make a "blanket holding" that "fraudulent activities toward a third party cannot, as a matter of law, be equated with 'manifest intent' to harm the bank." 113 F.3d at 634. "*[R]eckless conduct, taken as circumstantial evidence of intent*, could suffice to defeat a motion for summary judgment by creating a factual question for the jury." Id. at 636 (emphasis supplied).

In FDIC v. St. Paul Fire & Marine Insurance Co., 942 F.2d 1032 (6th Cir.1991), the FDIC took over a failed bank. The former president both embezzled money from the bank and approved several risky loans that also benefitted himself. The bank lost over $2 million. The FDIC made a claim under a banker's bond against St. Paul. The policy language included both the "manifest intent" and "financial benefit" clauses. 942 F.2d at 633-34.

The district court held that the "manifest intent" requirement was not satisfied, because the failure of the bank would also damage the president. The Sixth Circuit affirmed, but explained the standard to apply:

Nonetheless, even in the criminal context, *a trier of fact can make inferences regarding intent based on the natural and probable consequences of actions*. It could hardly be otherwise. Intent, as used in ordinary language, is thought to refer to a subjective phenomenon that takes place inside people's heads. In fact, however, *the word "intent" is really shorthand for a complicated series of inferences all of which are rooted in tangible manifestations of behavior*. For us, the external behavior ordinarily thought to manifest internal mental states is all that matters. *We need not concern ourselves with the question of whether mental states actually exist* . . .

942 F.2d at 1035 (additional emphasis supplied).  The panel held that "manifest intent exists when a particular result is 'substantially certain' to follow from conduct."  Id.

An unpublished decision by Judge Cleland is also of some interest.  In Phillip R. Seaver Title Co., Inc. v. Great American Ins. Co., No. 08-CV-11004 (E.D. Mich., Sept. 30, 2008), 2008 WL 4427582, an escrow closing agent took funds from customers' escrow accounts.  She concealed the fraud by moving money out of other accounts, but was eventually discovered and convicted of embezzlement.  The title company had to transfer money from its general fund to the escrow accounts to cover the losses.  It made a claim against its insurer, which paid part of it but denied coverage for a larger amount, representing what the title company had had to restore to the escrow accounts.  The applicable policy language referred to "loss ... resulting directly from dishonest acts committed by an employee ... with the manifest intent to: (a) cause you to sustain loss; and also (b) obtain financial benefit ... for (1) the employee ...."  Id. at *3.  The court agreed that the title company had suffered a "direct" loss.  Id. at *4.  It also found that the "manifest intent" requirement was satisfied:

> The court cannot delve into [the employee's] mind to determine whether she intended to harm Plaintiff, but that type of divination is not required. *It is enough to conclude as a matter of law that, based on [the employee's] conduct, there was substantial certainty Plaintiff would face a financial loss as a result of her embezzlement.* . . . To find otherwise would ignore the nature of an embezzlement. As such, the court finds Plaintiff has shown both a direct loss and the manifest intent required to establish coverage under the "liability" clause of the policy.

Id. at *4 (emphasis supplied).

### iii. "Substantial certainty" can be inferred under conditions similar to those of the present case.

A New Jersey Supreme Court case, Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc., 854 A.2d 278 (N.J. 2004), should be highly persuasive in the present matter.  Gentilini was a motor vehicle dealer which served as a conduit for installment purchase contracts financed by

Auto Lenders, primarily for higher-risk loans.  In 1998, Auto Lenders discovered that a Gentilini employee had submitted false credit applications or counterfeit documents in connection with a number of loans.  Some of the purchasers defaulted and Auto Lenders sued Gentilini.  It demanded both repayment of the losses on the defaulted loans and a right, under its contract with Gentilini, to have all outstanding contracts repurchased, even where there was no evidence of fraud.  Gentilini impleaded its insurance company.  The primary dispute was settled and the case proceeded on the insurance claim.  The relevant policy included the "manifest intent" and "financial benefit" requirements.  854 A.2d at 383.

The case was decided on cross-motions for summary judgment.  The trial court found in favor of the dealership; an intermediate appellate court reversed in a split opinion.  The New Jersey Supreme Court held that neither party was entitled to summary judgment.  As to the question of the dealership's "direct loss," the court "adopt[ed] the conventional proximate cause test as the correct standard to apply when determining whether a loss resulted from the dishonest acts of an employee," noting that "the majority of federal courts" had done the same.  854 A.2d at 386-87.

> *[The dealership] sustained a direct loss of Business Personal Property as the result of [the employee's] conduct when it was induced by his fraudulent acts to hand over automobiles in exchange for installment sales contracts signed by non-creditworthy customers*. Those contracts represented a promise by the individual purchasers to pay money over time. The value of those promises, however, was dependent on the accuracy of the information provided by the individual purchasers because only accurate information allowed for a realistic evaluation of the risk of loss on each individual contract. By producing fictitious pay stubs and drivers' licenses for twenty-seven applicants, [the employee] skewed the indicators used by both Gentilini and Auto Lenders to determine an applicant's creditworthiness, thereby exposing Gentilini to a risk of default it would not have been willing to accept in the absence of fraud. Thus, *any loss to Gentilini resulting from the default of the purchasers on the sale of the automobiles was proximately, and therefore directly, the result of [the employee's] actions.*

> *[T]he accuracy of the information provided by the purchasers and Gentilini's employees in those contracts was crucial to the effective operation of Gentilini's business.* As noted above, Gentilini was dependent on an assignment system to facilitate the sale of its automobiles; it entered into installment sales contracts with its customers with the knowledge that it would receive the financed portions of the sales from a lending institution such as Auto Lenders. [The employee's] actions disrupted that scheme because, under Gentilini's Dealer Agreement with its lenders, a condition for retaining the financed portion of its sales was that it provide accurate information about each purchaser. *When [the employee] falsified the credit applications* of twenty-seven individuals, *he effectively rendered the resulting contracts unassignable to Auto Lenders, ultimately depriving Gentilini of possession of twenty-seven automobiles and the profit to be made on those vehicles.*

854 A.2d at 386 (emphasis supplied).

In regard to the "manifest intent" requirement, the court held that "the manifest-intent standard is satisfied either by proof that it was an employee's purpose or desire to cause the insured to sustain a loss and to obtain a financial benefit at the insured's expense, or by proof that the employee knew the aforesaid loss and benefit were substantially certain to result from his or her conduct." 854 A.2d at 392. "[T]he materials presented would permit a rational fact-finder to resolve the alleged disputed issue in favor of the non-moving party in each instance." Id. at 393.

Another leading cases is First Nat'l. Bank of Louisville v. Lustig, 961 F.2d 1162 (5th Cir. 1992), which also involved a bankers bond. A bank employee made misrepresentations, mostly relating to the creditworthiness of the borrowers, in connection with several large real estate loans. The bank lost over $20 million as a result. When confronted, the employee "stated that he falsified the information to make good loans and get recognition at [the bank], not to get personal gain from customers." 961 F.2d at 1165. The bonding company rejected a claim and the case eventually went to trial[3]. The jury found in favor of the bank and the bonding company appealed.

---

[3] Lustig was a third party.

The policy language referred to losses "committed by such Employee with the manifest intent (a) to cause the Insured to sustain such loss by such Employee and (b) to obtain financial benefit for the Employee . . ." Id. at 1163.   The court held:

> To determine intent to cause a loss we do not inquire solely into the subjective motive or purpose of the employee. . . .Thus, the claim by an errant employee that no loss to the bank was intended will seldom be conclusive. When an employee obtains fraudulent loans with reckless disregard for a substantial risk of loss to the bank, a jury may infer from his reckless conduct and surrounding circumstances that he intended to cause that loss. *The bank need not produce any direct evidence of the employee's intent, but may rebut an insurer's motion for summary judgment with circumstantial evidence from which a reasonable jury could infer the intent to cause a loss. . .*

961 F.2d at 1166 (citations omitted; emphasis supplied).

FDIC v. Nat'l. Union Fire Ins. Co., 205 F.3d 66 (2nd Cir. 2000), was another case in which the FDIC pursued a claim on behalf of an insolvent bank.  The bank had been a limited partner in a real estate venture, owned by a man named Diesenhouse.  The bank's primary real estate officer had two other, undisclosed, associations with Diesenhouse.  Diesenhouse committed various illegal acts and eventually pled guilty to conspiracy to commit bank fraud.  Two of the partnership's employees testified that they had informed the bank officer about the fraud.  He took some actions to protect his own interests, but not the bank's.  He also promoted additional loans to the partnership.  The bank ultimately lost about $3 million.  When the FDIC took it over, it made a claim on the bank's fidelity bond.  The district court found that the bond covered the loss and the Second Circuit affirmed.

The applicable language required "manifest intent . . . to cause the Insured to sustain such loss, and . . . to obtain financial benefit for the Employee or another person or entity."  205 F.3d at 70.  After a review of the case law, the Second Circuit panel concluded that "whether a fidelity bond's manifest intent requirement has been satisfied is discerned by considering the relationship between the employee and his or her employer, the employee's knowledge that his conduct may

cause the insured a loss, and all other surrounding circumstances bearing upon the employee's purpose."  205 F.3d at 74.  "Finally, *manifest intent* does not require that the employee actively wish for or desire a particular result, but *can exist when a particular result is substantially certain to follow* from the employee's conduct."  205 F.3d at 74 (emphasis supplied).  It found sufficient facts "to establish as a matter of law that [the employee] manifested an intent to cause the Bank a loss" and held that the FDIC was entitled to summary judgment.  Id. at 75.

In addition to Gentilini Ford, *supra*, another state court decision is of interest.  The policy in Oxford Bank & Trust v. Hartford Accident & Indem. Co., 698 N.E.2d 204 (Ill. Ct. App. 1998) required "manifest intent" to "obtain financial benefit."  A bank officer colluded with a customer in a "check kiting" scheme, causing the bank to lose over $200,000; he also embezzled about $11,000 himself.  He later pled guilty to bank fraud.  The bank made a claim under its fidelity bond.  The trial court found for the bank.  "[The employee's] actions did not demonstrate a lack of good business sense[;] *they reflected a reckless disregard for a substantial risk to plaintiff*."  698 N.E.2d at 210 (emphasis supplied).  "[W]e find no reason to question the trial court's finding that [the employee] manifestly intended to cause harm to plaintiff."  Id.

### iv. Sinishtaj's actions indicated a "reckless disregard" that constituted a "substantial certainty" that harm would result.

In the present case, Sinishtaj knew, through Schwartz's weekly staff meetings, that "held offerings," i.e., loans not paid by the bank, created a "cash flow" problem and that anything that "would slow down a contract . . ."  should be avoided.

Sinishtaj specialized in "credit-challenged" customers, that is, those who were already at a higher-than-average risk of default.  She altered the income information about them and the descriptions of the vehicles precisely because Drive, or other lenders, would be unlikely to make the loans if they knew both the true state of the borrowers' income and the value of the collateral.

- 25 -

Sinishtaj, then, knew that it was all but certain that many of the customers whose purchases she financed would be unable to pay back the loans, and that Superior would be harmed by the resulting "held offerings."  As the <u>Gentilini Ford</u>, *supra*, case illustrates, where an employee of an auto dealer "induce[s] [his employer] by his fraudulent acts to hand over automobiles in exchange for installment sales contracts signed by non-creditworthy customers," he "deprive[s] [the employer] of the profit on the sales," because they are "rendered . . . unassignable" to a lender.

It can be inferred that Sinishtaj was "substantially certain," over the life of the many installment contracts Sinishtaj arranged with buyers who could not afford them, that a loss to Superior would result.  In addition, there is evidence to support a finding that Sinishtaj and Sinawi conspired to defraud Superior.

Thus, Sinishtaj can be found to have held a "manifest intent" to harm the insured.

### (c)

### <u>Sinishtaj's action satisfy the "financial benefit" requirement.</u>

An unreported Michigan opinion provides some guidance on the "intent to benefit" requirement of polices like Discover's.

<u>Dewitt Bldg. Co., Inc. v. Auto-Owners Ins. Co.</u>, No. 235536, 236945 (Mich. Ct. App., June 12, 2003), 2003 WL 21362804, reports very few facts in the opinion.  The plaintiff corporation dealt with an individual named Gorelick who owned a corporation, Century Construction.  Gorelick "defrauded several customers and personally accepted checks from the customers," although the opinion does not indicate how the frauds were carried out.

The applicable policy language was:

a. "Employee Dishonesty" in paragraph A.2, means only dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons, except you or a partner, with the manifest intent to:

(1) Cause you to sustain loss; and also

(2) Obtain financial benefit *(other than employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions) for:*

(a) The "employee"; or

(b) any person or organization intended by the "employee" to receive that benefit.

Id. at *; emphasis original.

The Michigan Court of Appeals affirmed a verdict for the plaintiff. "[T]he evidence supported the jury's finding that Gorelick committed a dishonest act while intending to benefit himself or Century through fraud." Id. at *4.

In General Analytics Corp. v. CNA Ins. Cos., 86 F.3d 51 (4th Cir. 1996), an employee altered several purchase orders, causing the plaintiff corporation to send the wrong merchandise to a major customer. The customer refused delivery. The merchandise could not be returned to the supplier and the plaintiff took a loss of $93,000. Although all the evidence pointed to a single employee as the source of the problem, she denied having made the changes. The company made a claim under its employee dishonesty policy, which contained the usual requirement of "manifest intent" to "obtain financial benefit other than employee benefits earned in the normal course of employment . . ." 86 F.3d at 53. The district court found for the plaintiff and the defendant appealed. The Fourth Circuit (applying Virginia law) vacated the judgment and remanded, finding the evidence "ambiguous" on both sides. Id. at 54-55.

An unreported Michigan opinion makes a similar point. In Gonzalez Design Engineering, Inc. v. Citizens Ins. Co., No. 287413 (Mich. App. 1997), 1997 WL 33350547, the plaintiff contracted with Ford Motor Company. One of its employees claimed to have worked more hours there than he actually did and Ford deducted the overpayment from what it paid

Gonzalez.  The plaintiff made a claim under its employee dishonesty coverage.  The policy contained the standard language:

> 3. Additional definitions
>
> a. "Employee Dishonest" in paragraph A.2. means only dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons, except you or a partner, with the manifest intent to:
>
> (1) Cause you to sustain loss, and also
>
> (2) Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions, or other employee benefits earned in the normal course of business) for:
>
> (a) The "employee" . . .
>
> The Court of Appeals reversed summary disposition for the insurer, holding
>
> [T]he policy language is ambiguous. Moreover, the purported exclusion is contained in the policy under the heading, "Additional Definitions", and is not properly designated as an exclusion. Accordingly, the policy language here should be strictly construed against the insurer. Because the dishonest employee in this case did not earn the improper financial benefit here "in the normal course of business", we conclude that the policy language does not specifically exclude plaintiff's claim.

Id. at *2 (emphasis supplied).

Sinishtaj's earnings were not in the "normal" course of her employment.  "Power booking" and falsifying credit applications were not "normal" at Superior Pontiac, as Schwartz made clear when he met with the staff.

This Court should find that the policy provides coverage for the "direct loss" caused by Sinishtaj's actions.

## RELIEF REQUESTED

Plaintiff Superior Buick, through its attorney John Kaplansky, respectfully asks that this honorable court GRANT its motion for summary judgment.

s/ John C. Kaplansky
JOHN C. KAPLANSKY (P23354)
30200 Telegraph, Suite 440
Bingham Farms, MI 48025
(248) 258-9444 / (248) 258-5854
j.kaplansky@att.net

DATED:       July 14, 2011